**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| **MINNEAPOLIS FIREFIGHTERS' RELIEF ASSOCIATION, on behalf of itself and all others similarly situated,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**MEMC ELECTRONIC MATERIALS, INC., and NABEEL GAREEB,**<br><br>**Defendants.** | Civil Action No. 08-cv-1411-CEJ<br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

1.      Plaintiff, Mahendra A. Patel, brings this Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint") individually and on behalf of all other purchasers of the securities of MEMC Electronic Materials, Inc. ("MEMC" or "Company") between June 13, 2008 and July 23, 2008, inclusive (the "Class Period").  Such purchasers, along with Plaintiff, are collectively referred to herein as the "Class."  This Complaint is brought against MEMC, the Company's former Chief Executive Officer ("CEO"), Nabeel Gareeb ("Gareeb"), and the Company's Chief Financial Officer ("CFO") and Senior Vice President, Kenneth H. Hannah ("Hannah") (the two individuals, collectively, the "Individual Defendants," and with the Company, "Defendants").

2.      This Complaint is alleged upon personal knowledge as to Plaintiff's own acts, and upon information and belief as to all other matters, based upon Plaintiff's counsel's

investigation, including review of MEMC's public filings with the United States Securities and Exchange Commission ("SEC"); wire and press releases published by and regarding MEMC; securities analysts' reports and advisories; information available in the media and on the Internet; and interviews with knowledgeable persons, including former MEMC employees, who held positions that provided them with personal access to the information which they reported. Additional facts supporting the allegations contained herein are known only to the Defendants or are exclusively within their control.  Plaintiff believes that substantial additional evidentiary support exists for the allegations set forth in this Complaint that will be revealed after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

3.      MEMC designs, manufactures, and sells silicon wafers for the semiconductor industry worldwide. Its products include prime polished wafers, such as OPTIA and annealed products; epitaxial wafers consisting of thin silicon layer grown on the polished surface of the wafer; and test/monitor wafers for testing semiconductor fabrication lines and processes. The Company's products are used in the manufacture of various semiconductor devices, including microprocessor, memory, logic, and power devices, as well as the starting material for solar cells. Its customers comprise semiconductor device manufacturers, including memory, microprocessor, and applications specific integrated circuit manufacturers, foundries, and solar cell and module manufacturers.

4.      On July 23, 2008, the Company shocked investors when it disclosed, for the first time, that in June 2008 there was a failure of a heat-exchanger at the Company's Merano, Italy facility that reduced the Company's second quarter polysilicon output by almost five percent. Additionally, on July 23, 2008, the Company informed investors for the first time that a loose

pipe fitting caused a fire on June 13, 2008 at the Company's Pasadena, Texas facility which resulted in a shutdown of half the silane production in that facility for approximately a week. This was the first revelation that the Company had suffered these significant problems at its production facilities. These problems caused the Company's second quarter net sales to be over $8 million less than the bottom range of the financial guidance that the Company issued in April 2008.

5.     Upon the release of this news, the Company's shares fell $11.57 per share, or 21.51 percent, from July 23, 2008 to close on July 24, 2008 at $42.23 per share, on unusually heavy trading volume.

6.     The Complaint alleges that, throughout the Class Period, Defendants failed to disclose material adverse facts about the Company's financial well-being, business operations and prospects.  Specifically, Defendants failed to disclose or indicate the following: (1) that the Company had experienced material disruptions in its Texas and Italy facilities; (2) that such disruptions had prevented the Company, to a material extent, from generating expected revenues; and (3) that, as a result of the foregoing, the Company's previously issued guidance became lacking in any reasonable basis and required immediate revision.

7.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class Members have suffered significant losses and damages.

## JURISDICTION AND VENUE

8.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

9.      This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

10.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.  Additionally, MEMC's principal executive offices are located within this District.

11.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

12.     Plaintiff Mahendra A. Patel ("Dr. Patel") purchased MEMC securities, in reliance on Defendants' false and misleading statements and omissions of material facts and/or the integrity of the market for MEMC securities, at artificially inflated prices during the Class Period and suffered economic loss and damages when the truth about MEMC that was misrepresented and omitted during the Class Period was revealed.  The Plaintiff's Certification of Dr. Patel containing a detailed list of his transactions in MEMC securities during the Class Period is attached hereto as Exhibit A.

13.     Defendant MEMC is a Delaware corporation with its principal executive offices located at 501 Pearl Drive, St. Peters, Missouri.  MEMC characterizes itself as a "leading worldwide producer of wafers for the semiconductor industry."  MEMC operates manufacturing facilities throughout the world, including Europe, Japan, Malaysia, South Korea, Taiwan and the

United States.  MEMC's customers include major semiconductor device manufacturers in the world, including the major memory, microprocessor and applications specific integrated circuit, or ASIC, manufacturers, as well as the world's largest foundries.  MEMC common stock is currently listed and traded on the New York Stock Exchange ("NYSE") under the symbol "WFR."  NYSE is a well-developed, efficient market for securities.

14.      Defendant Nabeel Gareeb ("Gareeb") was, at all relevant times, the Company's President and Chief Executive Officer ("CEO").  Defendant Nabeel Gareeb ("Gareeb") has been President and Chief Executive Officer ("CEO") and Director since April 2002 and continuing through the Class Period.  Prior to joining MEMC, defendant Gareeb was the Chief Operating Officer of International Rectifier Corporation, a leading supplier of power semiconductors. Defendant Gareeb joined International Rectifier in 1992 as Vice President of Manufacturing and subsequently held other senior management positions.  Defendant Gareeb resigned as President and Chief Executive Officer, effective November 12, 2008, but remained employed by the Company through December 31, 2008 to assist in the transition with the Company's Interim Chief Executive Officer.

15.      Defendant Kenneth H. Hannah ("Hannah") joined MEMC in April 2006 as Senior Vice President and Chief Financial Officer ("CFO") and currently still holds those positions.  He was most recently employed by The Home Depot, where he was the Senior Vice President, Operations, covering all aspects of The Home Depot's operations in the United States, Mexico, and Canada. Prior to that, he served as Senior Vice President, Finance, supporting all Home Depot stores in the United States and Mexico, as well as store operations and the global supply chain. Before Home Depot, defendant Hannah worked as Vice President for the Boeing Company where he led the audit and financial planning functions. He also held senior finance

positions at several GE divisions earlier in his career.

16.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of MEMC, were privy to confidential and proprietary non-public information concerning MEMC's operations, finances, financial condition, products, markets and present and future business prospects, via: their direct "hands on" involvement in MEMC's business; access to internal corporate documents, conversations and connections with other corporate officers and employees; attendance at management and/or board of directors meetings and committees thereof; and reports and other information provided to them.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein were misrepresented and/or had not been disclosed to, and were being concealed from, the investing public.

17.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of MEMC's business.

18.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the issuance and contents of MEMC's reports, press releases and presentations to securities analysts and the investing public.

19.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, governed by the federal securities

laws and registered with the SEC pursuant to the Exchange Act, and was, during the Class

period, traded on the NYSE, the Individual Defendants had a duty to promptly disseminate

accurate and truthful information with respect to MEMC's financial condition and performance,

growth, operations, financial statements, business, products, markets, management, earnings and

present and future business prospects, and to correct any previously issued statements that had

become materially misleading or untrue, so that the market price of MEMC securities would be

based upon truthful and accurate information. The Individual Defendants' misrepresentations

and omissions during the Class Period violated these obligations.

20.     The Individual Defendants are liable as participants in a fraudulent scheme and

course of conduct which operated as a fraud or deceit on purchasers of MEMC securities by

disseminating materially false and misleading statements and/or concealing material adverse

facts. The scheme: (i) deceived the investing public regarding MEMC's business, operations and

management and the intrinsic value of MEMC securities; and (ii) caused Plaintiff and other

members of the Class to purchase MEMC securities at artificially inflated prices, and to suffer

significant economic losses when the truth was revealed.

## CLASS ACTION ALLEGATIONS

21.     This action is brought by Plaintiff as a class action pursuant to Rules 23(a) and

(b)(3) of the Federal Rules of Civil Procedure on behalf of all persons who purchased MEMC

securities during the period of June 13, 2008 to July 23, 2008 (*i.e.*, the "Class Period") and who

suffered damages thereby (*i.e.,* the "Class").  Excluded from the Class are Defendants; officers

and directors of the Company and members of their immediate families, their legal

representatives, heirs, successors, or assigns; and any entity in which Defendants have or had a

controlling interest.

22.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, MEMC common stock was actively traded on the NYSE under the ticker symbol WFR.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, it is believed that there are hundreds or thousands of members in the Class geographically dispersed throughout the United States and the world.  Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and other Class members may be notified of the pendency of this action by mail, and by using the forms and methods for providing notice similar to that customarily used in securities class actions, including Internet and publication notice and notice to brokerage firms who held securities and/or traded MEMC securities on behalf of their customers during the Class Period.

23.    Plaintiff's claims are typical of the claims of the members of the Class as the claims of all members of the Class arise from, and were similarly affected by, Defendants' wrongful conduct in violation of the federal securities laws that are complained of herein.

24.    Plaintiff will fairly and adequately protect the interests of the members of the Class.  Plaintiff is a member of the Class and will vigorously represent the interests of Class members in the same manner as he will represent his own interests.  Plaintiff knows of no conflicts or antagonisms between his individual interests and those of other class members, and Plaintiff has retained counsel competent and experienced in class and securities litigation.

25.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.    whether the federal securities laws were violated by Defendants' acts as

alleged herein;

        b.      whether statements made by Defendants to the investing public during the Class Period misrepresented material facts or omitted to disclose material information that, under the circumstances, would render the statements made not false and misleading about the business, operations, and financial condition of the Company;

        c.      whether Defendants acted knowingly or recklessly in making materially false and misleading statements or omitting to disclose material information that, under the circumstances, would render the statements made not false and misleading during the Class Period;

        d.      whether Defendants engaged in schemes, artifices to defraud and/or manipulative conduct during the Class Period;

        e.      whether the market prices of MEMC securities were artificially inflated or distorted during the Class Period because of Defendants' conduct complained of herein; and

        f.      whether members of the Class have sustained damages and the proper measure of damages.

26.     Plaintiff intends to rely, in part, upon the presumption of reliance created by the United States Supreme Court in connection with the reliance element of his claims and the claims of the other Class members under Sections 10(b) and 20(a) of the Exchange Act and, therefore, individual questions regarding reliance do not predominate.  In particular, with respect to Defendants' material omissions alleged herein, reliance by Plaintiff and the other members of the Class is presumed.  With respect to Defendants' affirmative misrepresentations alleged herein, reliance by Plaintiff and the other members of the Class is presumed under the fraud-on-

the-market doctrine, because, at all relevant times, the market for MEMC securities was efficient for the following reasons, among others:

    a. MEMC common stock met the requirements for listing, and was listed and actively traded on the NYSE, which is a highly efficient market for securities;

    b. As a regulated issuer, MEMC filed periodic public reports with the SEC and MEMC was eligible to file S-3 registration statements;

    c. MEMC regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

    d. MEMC was followed by numerous securities analysts and investment market professionals.

27.     As a result of the foregoing, the market for MEMC securities rapidly absorbed all publicly material information regarding MEMC and that information was reflected in the price of MEMC's securities.

28.     Plaintiff and other members of the Class purchased MEMC securities between the time that Defendants made the material misrepresentations and/or omissions alleged herein and when the truth was finally and fully revealed to the public.

29.     Plaintiff is thus entitled to a presumption that all purchasers of MEMC securities during the Class Period suffered similar injury because they paid inflated prices for their MEMC securities in reliance on Defendants' material misrepresentations and/or omissions and/or in reliance on the integrity of the prices for MEMC securities, and suffered economic losses when

the truth was revealed on July 23, 2008, and the price of MEMC common stock and other MEMC securities declined in value in direct, proximate and consequential response to the corrective revelations.

30.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background

31.     MEMC manufactures and sells wafers and has been a pioneer in the design and development of wafer technologies over the past four decades. MEMC's customers include major semiconductor device and solar cell manufacturers.  In the first quarter of 2007, MEMC began delivering wafers targeted for solar applications. Depending on market conditions, MEMC also sells intermediate products such as polysilicon, silane gas, partial ingots and scrap wafers to semiconductor device and equipment makers, solar customers, flat panel manufacturers and other industries.

32.     According to MEMC's website, the Merano, Italy facility manufactures single crystal ingots and polysilicon.  The Pasadena, Texas facility produces ultra-pure granular polysilicon, the base material for the manufacturing of silicon wafers.  Monosilane and $SiF_4$ gas, a by-product of the granular polysilicon manufacturing process, are also produced at the Pasadena facility.  The facility is now a major world supplier of semiconductor and solar-grade

polysilicon and semiconductor-grade silane.  According to an article published in *Semiconductor International* on April 3, 2008, entitled "*MEMC Fixing Buildup Issues at Texas Polysilicon Facility,*" the Pasadena facility accounts for two-thirds of MEMC's total polysilicon capacity.

33.    Further, according to the Company's Form 10-K filed on February 29, 2008 with the SEC, the Company's main raw material in its production process is polysilicon.  The two types are granular polysilicon and chunk polysilicon.   The Company produces all of its requirements for granular polysilicon at the Pasadena, Texas facility.  The Company also produces chunk polysilicon in the Merano, Italy facility.    The Company also stated that its "ability to meet the majority of our polysilicon requirements through [its] in-house capabilities provides [them] with a key cost advantage to compete more effectively in the wafer industry."

34.    The February 29, 2008 10-K further discussed risk factors related to the Company's business, and stated, in part, the following:

> We obtain several raw materials, equipment, parts and supplies from sole suppliers. Likewise, we obtain all of our requirements for granular polysilicon from our facility in Pasadena, Texas. In the case of granular polysilicon, we believe that we could substitute chunk polysilicon for granular polysilicon. We cannot predict whether this substitution would be successful or how long this process would take. In addition, our manufacturing process could be interrupted and our manufacturing throughput and yields could be adversely affected. ***A failure to obtain a new qualification or a decrease in our manufacturing throughput or yields could have a material adverse effect on our operating results.***
>
> *              *              *
>
> It typically takes three to six months for our customers to qualify a manufacturing facility to produce a specific product, but it can take longer depending upon a customer's requirements and market conditions. Interruption of operations or lack of available additional capacity at any of our primary wafer manufacturing facilities could result in delays or cancellations of shipments of wafers and a loss of product volume. ***Likewise, interruption of operations at our granular polysilicon manufacturing facility could adversely affect our wafer manufacturing throughput and yields and could result in our inability to produce certain qualified wafer products, delays or cancellations of shipments***

*of wafers and a loss of product volume.* An August 2007 accident at this facility caused reduced product volumes and increased costs in the 2007 third quarter. *Similarly, an interruption of our chunk polysilicon manufacturing operations could adversely affect our results of operations.* A number of factors could cause interruptions, including labor disputes, equipment failures, shortages of raw materials or supplies, or transportation logistic complications. [Emphasis added.]

35.     According to a June 29, 2008 article published by *Seeking Alpha*, entitled "*MEMC Electronic Materials: Climbing the Wall of Worry,*" by Tobin Farrand, "[t]he sensitive nature of the refining process makes even a temporary loss a catastrophic event resulting in days or weeks of lost production." The article further stated that "[t]his vulnerability is exacerbated by MEMC's very lean production processes and practices which lead to very little inventory being available to cushion the blow of any production loss." Because MEMC has "just over 1 week of inventory of all kinds on hand," it is "very cash efficient, but not resilient in the face of any unexpected event in production."

**Disclosures Prior To The Class Period**

36.     Prior to the Class Period, the Company's financial results had been adversely impacted by production problems at its Pasadena, Texas facility that materially impacted the Company's financial results, specifically for the periods ended September 30, 2007, December 31, 2007 and March 31, 2008. According to an article by Eric Savitz published on *Seeking Alpha* on September 5, 2007, entitled "*MEMC Cuts Q3 Guidance Due To Pasadena Construction Accident,*" the Pasadena, Texas facility accounts for 70% of MEMC's total production.

37.     On September 4, 2007, MEMC filed its Form 8-K with the SEC, signed by defendant Hannah, which attached a press release entitled "*MEMC Provides Updated Third Quarter Guidance*" as an exhibit. The press release discussed a construction incident at the Pasadena, Texas facility that caused MEMC to lower its third quarter 2007 guidance by

approximately 5%.  The press release stated, in part, the following:

> The company reported that mid-last week, *a construction incident caused by one of its electrical subcontractors working on the Pasadena, Texas, polysilicon facility expansion resulted in a power outage to the entire site*. Although the power was eventually restored later the same day, the unplanned and abrupt shutdown of high temperature and pressure chemical operations caused considerable complications. *The facility is now in the late stages of recovery, but the abrupt nature of this incident, combined with the rain and thunderstorms in Pasadena, Texas over the last few days, has hampered the facility's ability to recover operations expeditiously.* This disruption has also caused the on-going polysilicon expansion project at the site to be additionally delayed. The combined effect of these events has resulted *in an approximate one week impact to the company's output for the quarter.*
>
> As a result, the company is revising its Q3 guidance. *Specifically, the company is now targeting revenues to be approximately 5% below the previously targeted level of $500 million and margins to be approximately flat sequentially from second quarter 2007 levels due to the associated costs.* [Emphasis added.]

38.     On October 25, 2007, MEMC filed its Form 8-K with the SEC, signed by defendant Hannah, which attached a press release entitled "*MEMC Reports Third Quarter Results.*"  The press release reported results of operations for the quarter ended September 30, 2007.  The press release stated, in part, the following:

> The impact associated with the *previously disclosed construction incident* at the company's Pasadena polysilicon manufacturing facility was the *primary factor contributing to the sequential reduction in gross margin.* [Emphasis added.]

39.     Commenting on the results, defendant Gareeb stated, in part, the following:

> Early last month we announced that a construction incident caused an abrupt power interruption at our Pasadena polysilicon production facility. Although the power was quickly recovered, *the extended effects of the incident caused us to lose well over a week's worth of production, miss our cost projections by the double digit millions, and delay our expansion.* In spite of this incident and its unanticipated consequences, we are pleased to report healthy sales and profits during the quarter, and a strong improvement over the year-ago quarter. [Emphasis added.]

40.     In an earnings call discussing the Q3 2007 financial results on October 25, 2007, defendant Gareeb mentioned the construction incident and stated, in part, the following:

To give an update on Pasadena, as you know, a construction incident caused by electrical subcontractor resulted in a power outage to our Pasadena polysilicon manufacturing facility.

As we ramped the plant, there were complications that prevented us from recovering to our desired run rates in the plant manner and timetable. We were able to approximately **meet the pre-announced revenue targets** in part by drawing down inventory. **However, the lower than anticipated poly production resulted in lower utilization at our wafer manufacturing sites, thereby impacting our gross margin to a greater than anticipated extent.**

**We have recovered from this discrete event to a steady state rate of production and are pleased to indicate that we are targeting to achieve the level of Q4 revenue targeted prior to the construction incident and be able to recover some of the lost revenue from Q3.** In addition, we have made no change to our target of achieving 2007 year-end polysilicon capacity of over 6,000 metric tons per year. [Emphasis added.]

41.    On January 24, 2008, MEMC filed its Form 8-K with the SEC, signed by defendant Hannah, attaching a press release entitled "*MEMC Announces Fourth Quarter & Full Year Results*," which reported the results of operations for the quarter and year ended December 31, 2007.

42.    During the January 24, 2008 earnings call for the Q4 2007 financial results, defendant Hannah discussed a problem at the Pasadena, Texas facility that caused the Company to miss its revenue target by about $5 million.  Defendant Hannah, stated, in part, the following:

**HANNAH:** Thanks Bill. MEMC delivered fourth quarter sales growth of 13% over the previous quarter. Driven by higher product volumes. Fourth quarter sales of $535.9 million were also 27% higher than the same quarter last year. ***Although, we missed our revenue target by less than one days worth of production due to earlier than planned maintenance activity required on our polysilicon equipment in Texas.*** [Emphasis added.]

43.    During the January 24, 2008 earnings call, other additional exchanges took place between defendant Gareeb and various analysts regarding the production problems in the Pasadena facility:

**Gordon Johnson - Lehman Brothers:** Okay. And then lastly, I guess on the revenue line, a bit softer than expected this quarter. Can you talk a little bit about kind of what drove that?

**GAREEB:** Yes. On the revenue in Q4, really what the issue with the revenue shortfall from our target as kind of alluded to in statement *was that we ended up needing to do maintenance on some pieces of poly equipment in our Pasadena, Texas facility in December, in the last week really of December rather than in January as we had originally anticipated.* And you can try to predict these things, but you can't, it's not very scientific. And our expansion that was coming online was really planned to offset that maintenance activity in January, not in December. So instead of growing by 15% sequentially, we grew by 13%, and margins you saw what happened up well over 400 bases points. And so really, it was about a 1 day's impact, even though we did the some of that maintenance in the fourth week.

*     *     *

**Tim Luke - Lehman Brothers:** Thanks Nabeel, couple of quick questions. Just if you can comment what are the milestones going forward now on your payment schedule and I was just wondering *if you could clarify again in terms of the one day disruption that you saw that impact the fourth quarter revenue*. Can you just clarify what that was again? Thanks.

**GAREEB:** So the fourth quarter piece Tim, *the net affect was basically one days worth of production that you saw in that approximately $5 million off the target that we had articulated it wasn't the*...

**Tim Luke - Lehman Brothers**: When did that come... when did you get that disruption?

**GAREEB:** *Right, so it wasn't a lets call it a disruption, call it early maintenance really. We had anticipated that semi-annual maintenance would be occurring in the January, February time table and basically because of the shut down in September some of those pieces of equipment weren't running at a 100% operational efficiency.* And so you can't really predict this plus, minus in a couple in a weeks and we thought it would happen January, February we had to basically take them down in the 4th late 3rd week, early 4th week of December and do some maintenance on them. *And so that really cause[d] the shortage of poly which ripples through the entire pipeline. That's obviously behind us and we did some maintenance on that in December, we did some maintenance on that this week and we'll do some again in probably late this quarter and so the expansion will offset those maintenance activities in this quarter.* [Emphasis added].

44.     The January 24, 2008 press release also provided the Company's guidance for the

first quarter of 2008. Defendant Gareeb, discussing the guidance, stated, in part, the following:

> Based on customer input, we are targeting first quarter 2008 sales to be approximately $560 million. In addition, we are targeting margins to be approximately flat to slightly up compared to the exceptional fourth quarter. Operating expenses are targeted to be approximately $42 million as a result of the timing of stock compensation expenses within 2008.

45.     On April 3, 2008, the Company filed its Form 8-K with the SEC, signed by defendant Hannah, which attached a press release entitled "*MEMC Provides First Quarter Update*" as an exhibit. The press release announced the results of operations for the quarter ended March 31, 2008. The press release, in discussing the reasons for the first quarter guidance update, stated, in part, the following:

> The company reported that during the first quarter it experienced accelerated buildup of chemical deposits inside the new expansion unit ("Unit 3") at its Pasadena, Texas facility. ***These buildups occurred multiple times, and each instance required downtime of several days for premature maintenance to clean and re-stabilize the unit.*** The company also delayed the remaining maintenance (from the prior quarter) on the existing units ("Unit 1" and "Unit 2") waiting for Unit 3 to stabilize, but eventually had to perform the maintenance on Unit 2. ***The combination of these items caused the utilization of the Pasadena facility to be approximately 20% lower than the fourth quarter, resulted in much lower than anticipated output, and caused the company to not achieve the financial targets for the first quarter as disclosed on January 24, 2008.***
>
> The company now anticipates revenue for the first quarter will be approximately $500 million with gross margin of approximately 52% and operating expenses of approximately $42 million. This compares to the company's previously announced targets of $560 million in revenue with gross margin of approximately 54.8% and operating expenses of approximately $42 million. [Emphasis added.]

46.     On April 24, 2008, the Company filed its Form 8-K with the SEC, signed by defendant Hannah, attaching a press release entitled "*MEMC Reports First Quarter Results*" as an exhibit. The press release announced the results of operations for the quarter ended March 31, 2008. Defendant Gareeb, commenting on the first quarter results, stated, in part, the following:

> Regarding our production and maintenance efforts in Pasadena, ***our new unit (Unit 3) has demonstrated good results, and the announced maintenance***

*activities on our pre-existing unit (Unit 1) have been completed.*

Demand indications from semiconductor application customers are a bit weaker than typical, resulting in additional price declines from first quarter levels. Demand from solar application customers, however, continues to be strong. *Although we are pleased with the results of the actions we have taken to address the issues that caused the lower than targeted polysilicon volume in the first quarter, <u>given the unplanned issues that were encountered with our expected polysilicon ramp</u> in the first quarter, <u>we feel it is prudent to be extra cautious regarding our polysilicon output expectations</u> in the second quarter. As a result, we are targeting revenues of approximately $540 to $570 million for the second quarter.* In addition, we are targeting gross margin of approximately 54%-55%, with operating expenses of less than $40 million.

Regarding our polysilicon expansion, *we are currently targeting to achieve mechanical completion of Unit 4 (silane unit) in our Pasadena facility before the end of the second quarter,* as well as additional polysilicon reactor capacity in the third quarter. This combination will mark the mechanical completion of our 8,000 metric tons of capacity which was originally targeted for the end of 2008. Depending on the output ramp of the different units, this improved installation schedule may allow us to make good progress toward achieving our annual financial targets in the second half of 2008. [Emphasis added.]

47.     Defendant Gareeb clearly understood that when speaking about production matters at its Pasadena, Texas facility, each day of production was important in order to achieve the Company's production goals.  For example, during an earnings call for the first quarter of 2008, defendant Gareeb pointed out that: "*Unit 1, as we had said, was down for maintenance. Obviously that maintenance is now complete. <u>That maintenance took a few days longer because we had run it to failure and so it took a little bit longer to clean up.</u>*" [Emphasis added.]

48.     Also, during the Q1 2008 earnings call, defendant Hannah, in presenting an overview of the financial results, stated, in part, the following:

*We feel it is prudent to be extra cautious regarding our polysilicon output expectations in the second quarter.* As a result we're targeting revenues of approximately $540 million to $570 million for the second quarter. In addition, we're targeting gross margin of approximately 54% to 55% with operating expenses of less than $40 million. [Emphasis added.]

49.     During the same call, defendant Gareeb provided an update on the Pasadena facility, and stated, in part, the following:

> To give you an update on Pasadena, as you know, accelerated chemical deposits experienced inside our expansion unit, Unit 3, resulted in reduced output for the quarter. On our update call earlier this month, we reported that Unit 3 was ramping, but Unit 2 was running with good output and that Unit 1 was undergoing maintenance. ***Since then, maintenance on Unit 1 has been completed and Unit 3 has demonstrated good results. While we are encouraged by the progress and are trying to be more cautious than normal, we are still providing second quarter targets that would result in strong sequential growth in revenue and margins.***
>
> In the near term, I remain encouraged by our progress on our polysilicon expansion. ***We are currently targeting to achieve mechanical completion of our Unit 4 silane unit before the end of the current quarter, as well as additional polysilicon reactor capacity in the third quarter. This combination will mark the mechanical completion of our targeted 8,000 metric tons of polysilicon capacity, which was originally targeted for the end of 2008.*** [Emphasis added.]

50.     In addition, during the Q1 2008 earnings call, the following exchanges took place between defendant Gareeb and various analysts:

> **GAREEB** [in response to a question by analyst Stephen Chen from UBS asking for further elaboration on the revenue guidance]: Fundamentally, if you look at Unit 3, when we last had the call about three weeks ago, ***Unit 3 was running at about, was in the midst of ramping, and running at about 60%, 70% utilization rates, and for the last three weeks basically it's been averaging between 80% and 90%.*** Okay. So it's demonstrating pretty good results. ***Unit 1, as we had said, was down for maintenance. Obviously that maintenance is now complete. That maintenance took a few days longer because we had run it to failure and so it took a little bit longer to clean up.*** There was more to clean up. But in essence, as we also mentioned on the last call when somebody asked the question, our dollarized capacity is roughly between $700 million and $800 million a quarter. So if everything, all the stars lined up and we didn't have any planned maintenance or unplanned maintenance already downtime, etcetera, you could have achieved the upper end of those. ***So what we are doing in our guidance is basically, obviously number one, we are allowing for some additional planned maintenance because Unit 1 was down during the early part of this quarter. In addition, we also lined for some planned maintenance should we need to go into Unit 3 or Unit 2 to clean it up or look at things and make sure that it's running the way we think at least to run for a six-month or a nine-month period and then more important than that is the unplanned part of it.*** We are basically

19

[inaudible] because we're at the forefront of this expansion in this technology and basically we experienced some unforeseen problems in Q1. Now, as you know, nobody else does granular polysilicon at this scale even though it is cheaper than chunk and the reason they don't do it is because it is difficult as a process. So although, we feel very good about the actions we have taken to address the issues, we definitely need to prove it and we want to make sure that we're capable of proving it in Q2 and ***so we are just trying to be prudent by providing extra cautious guidance this quarter.***

**Stephen Chin – UBS**: I want to just say a last clarification. As you're saying Unit 4 is going to be mechanically ready by the end of this current quarter, is it fair to assume that Unit 4 is going to contribute to MEMC sales in the third quarter and what kind of utilization rates should we be assuming for Unit 4?

**GAREEB**: Yes. So let me, I'm going to give you some more detailed information as well not to complicate but to explain it a little bit better. Last time we talked it was just Unit 4. Now, what I did talk about last time was ***Unit 4 is basically just is the unit that actually makes the silane gas.*** Right? And then that silane gas is converted to poly. So then there is also poly reactors required to make that poly. So last time, we talked I said Unit 4 might be completable by the end of Q2. What we're now saying is we are now targeting Unit 4 to be completed prior to the end of Q2. That will give us some silane gas to use with existing poly reactors depending on the ramp, of course. But that capacity will be available prior to that in the Q2. Then, in the early part of Q3, we'll have poly reactors that will be also to be coupled with that unit to basically give us capacity up to about 7,500 metric tons, approximately. Okay. That's the combination of the expansion in Pasadena. There was also about 500 metric tons planned in Merano for Q2 that was going to be complete prior to the end of Q2 and basically what we have done is we have pushed that out into Q3 as a conscious decision here in the last few weeks because that required downtime and I didn't want to take any downtime to cause any more uncertainty in our ability to produce poly for the quarter. So yes, Unit 4 will allow me to ramp... potentially ramp a little bit. It'll add a few hundred metric tons annualized capacity, then the poly reactors will add more up to 7,500 metric tons.

\*     \*     \*

**Jeff Osborne - Thomas Weisel Partners:** That's great. I just had a question on the inventory that's been down several quarters in a row and ***you've obviously had a few production hiccups***. So I just wanted to make sure and clarify that the sequential decline [inaudible] to ensure that you delivered to your solar customers or can you talk about which way it'd trend next couple of quarters out?

**GAREEB: *Yes, I think, like you said, it was just simply obviously the production hiccup and we... the amount of inventory decline was pretty nominal if you just look at the valuation change as the cost goes down, as an example, the valuation of similar units of inventory also goes down.*** So, even if the units

of inventory were flat, the dollar value would actually go down, because the cost of those units went down. So, we believe basically the change from Q4 to Q1 was pretty nominal at best, and the hope is that as we continue our expansions, there will be the opportunity to put some high elements back in inventory, but probably not a lot. We're pretty much like where we have got into in terms of running up a very lean supply chain now.

**Jeff Osborne - Thomas Weisel Partners:** Very good, and just two quick ones, Nabeel, you mentioned you're adding 500 metric tons in Merano. Is Merano right now at about 1,500 in the year of 2000?

**GAREEB:** Well, yes we didn't break out specifics. We were trying to stay away from all these specifics, which kind of get very complicated very fast, *but what we had said was when we were at about between 4,000 and 6,000, we had said is about a third Merano and about two-thirds Pasadena.* So, those were the general guidelines. And then, you can obviously add to that.

*        *        *

**Paul Leming - Soleil Securities:** And then, if I could just the last question, I've got a lot questions from the investors the last few weeks trying to understand the impact of the maintenance you talked about at Pasadena on units, 1, 2 and the future Unit 3. If you look backwards towards Pasadena having something around 3,000 tons of capacity before this expansion started. Given the maintenance turnaround, let me talk about having the delivery six months on each unit. *What is the capacity at Pasadena? Could you physically produce 3,000 tons in a year or once, where the maintenance turnaround factored into that number or a 3,000 tons of capacity at semi that you never take the units down for maintenance?*

**GAREEB:** Yes I think traditionally, what we... *when we've talked to people we basically talked about the 8,000 or the 6,000 of the year-end capacity numbers as our eventual effective output numbers.* Not just raw capacity numbers, so that's basically how I would recommend you think about it as well. Same thing for this revenue or dollarized figure that I started coding last… since the last call which was basically $700 million to $800 million, and that range obviously depends a little bit on the maintenance and the mix of product and all of those good things as well. [Emphasis added.]

51.    When the Pasadena, Texas plant experienced a production interruption resulting

from a gas leak on April 24, 2008, the Company issued a press release that same day entitled

"*MEMC Provides Status Update After Raw Material Release*" reporting that a transfer line

developed a leak and caused a release of raw material gas but that the Company did not

anticipate any impact on financial targets that had been provided earlier.  The press release

stated, in part, the following:

> The company reported that at approximately 4:20 PM this afternoon a transfer line from a transport vehicle developed a leak and caused a release of STF, a raw material gas used in the manufacturing process. The leak was quickly contained by the on-site emergency response team and the flow of material was stopped. At this time the company does not believe there was any offsite impact from the release due to the quick dissipation of the material in the atmosphere. Approximately 18 people were transported to area hospitals for further evaluation and/or treatment.
>
> *          *          *
>
> At this stage, the company anticipates that production will resume on Friday, April 25, 2008 and ***does not anticipate any impact to the financial targets provided earlier today as a result of this incident.***  [Emphasis added.]

52.     To ensure that investors were kept apprised of the status of the impact of this event on production, on April 29, 2008, the Company issued a second release entitled "*MEMC Provides Status Update on Pasadena Facility*," confirming that production at its Pasadena facility did, in fact, resume on April 25, 2008 and all three of the facility's silane units were operational.

53.     Thus, the Company has set a precedent for promptly informing investors of events having a potential impact on production and confirming that the prompt resumption of production after such an event.  For just Q3 2007, Q4 2007 and Q1 2008, the Company provided two timely updates on previously issued guidance when an event possibly affecting production, and thus that guidance, had taken place and issued two additional press releases regarding events even when the Company did not believe there would be an impact on production.  As alleged above, on September 4, 2007, the Company adjusted its Q3 2007 guidance after a construction incident that caused a power outage which was restored later that day.  On April 3, 2008, the Company updated its Q1 2008 guidance due to "accelerated buildup of chemical deposits" in the Pasadena, Texas facility.  On April 24, 2008, the Company issued a press release regarding a gas

leak that the Company did not expect to impact financial targets.  Finally, on April 29, 2008, the Company updated the April 24, 2008 press release and confirmed that production at the Pasadena facility had resumed.  Having established this precedent, the Company created an expectation that it would, and thus had a duty to, promptly disclose events that might impact production that the Company had reason to believe would be of importance to investors.

54.     Given its past production problems and the adverse impact such problems had on the Company's financial condition, Defendants were well aware that investors would find any production problems to be highly material.  In fact, during the 1Q 2008 press release, Defendants stated that "we feel it is prudent to be extra cautious regarding our polysilicon output expectations."  Because Defendants were being "prudent," investors were left to believe that in the event anything occurred that might knowingly (to Defendants) reduce revenue indicated in their previous guidance, the Company would promptly disclose such information.

55.     According to Defendants, the output from the Company's Pasadena, Texas facility during the month of May and early part of June had positioned the Company on a trajectory to exceed the upper end of the Company's targeted second quarter revenue range.

56.     Indeed, on June 5, 2008, the Company met with analysts from Deutsche Bank and, after the meeting, on June 6, 2008, Deutsche Bank issued a report in which it stated, in part, that "We hosted MEMC Electronics management in San Francisco yesterday, and while the company offered no new or incremental guidance, *we are increasingly convinced that recent production issues are largely resolved*, that silicon pricing remains very strong, and that semiconductor industry pricing weakness will likely be compensated for by solar PV business strength. We maintain our Buy rating." [Emphasis added.]

23

**Material Omissions and Nondisclosures During the Class Period**

57.     The Class Period begins on June 13, 2008.  On this day, there was a fire caused by a loose pipe fitting at MEMC's Pasadena, Texas facility that caused the Company's silane production to be shut down.  The Company did not disclose the event, and the local newspaper, the *Pasadena Citizen*, diverted by a story regarding the murders of several children by their father, did not report the fire, such that there was no press coverage of the event.  Also in June 2008, a heat-exchanger at the Company's Merano, Italy facility failed, causing an interruption in the Company's polysilicon output at that plant.

58.     Given the Company's past production issues and the precedent the Company set by promptly informing investors of any events that would potentially impact production, at the beginning of the Class Period, Defendants should have informed investors about the problems at MEMC's Pasadena, Texas and Merano, Italy facilities, but failed to do so.  Rather than remaining silent regarding the occurrences in the Pasadena, Texas facility and the Merano, Italy facility, MEMC had a duty to disclose: (1) that the Company had experienced material disruptions in its Texas and Italy facilities; (2) that such disruptions would prevent the Company, to a material extent, from generating expected revenues and reach its previously issued guidance; and (3) that, as a result of the foregoing, the Company's previously issued guidance became lacking in any reasonable basis and required immediate revision.

59.     The fire caused the Company's silane production at the Texas facility to be shut down for a week.  There was a strong possibility that such an interruption in production would have an adverse impact on earnings and would cause the Company's previously published financial projections to be inaccurate.  Similarly, the failure of the heat exchanger in the Merano, Italy plant caused an interruption in the Company's production of polysilicon.  There was a

strong possibility that such an interruption in production would have an adverse impact on earnings and would cause the Company's previously published financial projections to be inaccurate. In fact, during the June 23, 2008 earnings call, discussed below, defendant Gareeb admitted that the Company knew that the previously issued guidance lacked any reasonable basis. Defendant Gareeb stated, "And so we didn't take that as a pre announcement in terms of doing it earlier in this quarter if you will, primarily because we didn't think 2% outside the bottom end of the range was material if you will." The production issues at the Company's Italian facility and the Pasadena facility combined, Defendants knew, yet failed to timely disclose, would materially adversely impact MEMC's financial results for the period ended June 30, 2008.

60.     Several confidential witnesses confirmed that it was known to Defendants, including, specifically defendant Gareeb, that at the time of these incidents, production would be impacted. According to a confidential witness who was employed as a Shipping Operations supervisor from 1995 until approximately two months after the Class Period ("CW1"), all MEMC plants submitted daily output reports and there were daily conference calls about production results. Further, according to CW1, defendant Gareeb knew everything about production at the MEMC plants and was on these daily calls 95% of the time. CW1 further stated that defendant Gareeb was a micromanager and micromanaged the allocation of polysilicon down to the customer level. Corroborating the testimony of CW1, another confidential witness (CW2), an Operations Manager for Crystal Pulling from 1979 until mid-July 2008, stated that everything that happened at MEMC was channeled through defendant Gareeb, who controlled everything, including information disclosed by the Company.

61.     According to another confidential witness (CW3) who was employed as a Silicon

Crystal Growth Technician at MEMC from May 1987 through approximately a month after the Class Period, the Pasadena fire affected production of material that caused crystal pulling reliant on that production to be shut down.

**The Truth Is Revealed**

62.     On July 23, 2008, the Company filed its Form 8-K with the SEC, signed by defendant Hannah, attaching a press release that was released on July 23, 2008 after the market closed entitled "*MEMC Reports Second Quarter Results.*"   The press release shocked investors with the results of operations for the quarter ended June 30, 2008, which were below the bottom end of the previously issued guidance.  The press release stated, in part, the following:

> **The company reported second quarter 2008 net sales of $531.4 million,** which represents an increase of 6.0% from first quarter 2008 net sales of $501.4 million, and an increase of 12.4% from second quarter 2007 net sales of $472.7 million. The increase in net sales was primarily the result of higher product volumes. [Emphasis added.]

63.     Commenting on the second quarter results, defendant Gareeb stated, in part, the following:

> MEMC grew sales by 6% sequentially, expanded gross and operating margins by 150 and 200 basis points, respectively, continued to generate industry-leading levels of free cash flow at 22% of sales, and further expanded our cash and investment balances to approximately $1.5 billion. **However, our financial results were a bit below the bottom end of our targeted range as the company encountered unanticipated events towards the tail end of the quarter.**
>
> **The premature failure of a relatively new heat-exchanger at the company's Merano, Italy facility in June reduced the company's second quarter polysilicon output by just under five percent. The output from the company's Pasadena, Texas facility during the month of May and early part of June (shown on the attached silane and polysilicon output charts) had positioned the company on a trajectory to exceed the upper end of the company's targeted second quarter revenue range. Unfortunately, a loose pipe fitting caused a fire at the company's Pasadena facility that required a shut down of half the silane production commencing on Friday June 13. Even though** the complications lasted for approximately a week, **the Pasadena facility recovered and managed to produce enough silane and polysilicon during the remainder of the quarter to**

*be in the middle of that facility's targeted range for second quarter production, but there was not enough Pasadena production to completely offset the Merano shortfall.*

*While we are disappointed that we experienced an uncharacteristic event at our Merano facility, we are pleased that we were able to limit the impact to a few percent below the targeted revenue range.* This was primarily a result of the accomplishments in the second quarter that helped to offset the Merano shortfall. Specifically, we:

-   Achieved strong output from Unit 3 in Pasadena, overcoming most of the issues that held us back in the first quarter. While *output was limited by the fire incident and its associated complications,* the unit has recovered well.

-   Completed and ramped Unit 4 in Pasadena over a month prior to the end of the quarter, *with the unit running at good rates save for the interruption of the fire incident.* [Emphasis added.]

64.   Further, included in the July 23, 2008 press release were two charts setting "forth a three day average of daily silane and polysilicon production output at [the] Pasadena, Texas polysilicon facility over the course of the second quarter and through July 22, 2008." According to the release, the "charts also include indications of each of the significant production related events at the Pasadena facility from April 1 through July 22, 2008." The second chart only listed the "fire incident" and the "STF leak." While the STF leak was timely disclosed, the "fire incident" was not. Therefore, although the Company considered both "significant production related events," the Company only disclosed one of them on a timely basis. Further, the STF leak that was disclosed was not only disclosed on the same day, but was disclosed even though the Company believed at the time that it would not have any impact on the financial targets.

65.   Also on July 23, 2008, the Company filed its Form 8-K with the SEC, signed by defendant Hannah. The Form 8-K stated the following:

MEMC Electronic Materials, Inc. (the "Company") reported that effective July 22, 2008, Sean Hunkler is no longer serving as Senior Vice President, Manufacturing for the Company.

27

66.     On July 23, 2008, the Company also held an earnings call to discuss the Q2 2008 financial results.   Before answering questions from analysts, defendant Gareeb provided an overview of why MEMC's financial results were below the low end of the range.   Defendant Gareeb stated, in part, the following:

So let's start with a summary of what caused us to miss our targeted range of results. ***The premature failure of the heat exchanger that was relatively new at our Merano facility in June, reduced the company's total second quarter polysilicon output by just under 5% for the quarter. While Pasadena had been running enough ahead of schedule to offset the Merano shortfall, complications there from a loose pipefitting and resulting fire caused us to shut down half the silane production on June 13th.***

And while the facility recovered from this fairly quickly and manage to produce enough silane and polysilicon to be in the middle of its targeted range for production, ***Pasadena could not produce enough product fast enough to offset the Merano shortfall and allow us to finish the quarter within our targeted band of revenue.***

***I am disappointed that we were not able to avoid additional unexpected events in Q2 or result the complications Merano faster or produce more polysilicon in Pasadena to offset all the Merano shortfalls.*** However, what I am pleased and excited about is the following: First, in Pasadena, ***Unit 3 overcame the issues that held us back in Q1 although with some limitations due to the fire***, but has recovered well. ***Second, Unit 4 was started up over a month prior to the end of the quarter and has ramped and run at good rates other than interruption of the fire.***

***Third, the combined output from Units 3 and 4 during May and early June alone had positioned us on a trajectory to finish the quarter ahead of the upper end of our targeted revenue range*** and the strong output allowed us to offset a portion of the Merano shortfall in the last week of June.

Fourth, we have completed this technically and operationally challenging phase of silane expansion in Pasadena, and now have a high level of confidence in the longer-term performance of Units 3 and 4. We expect this should eliminate silane production as a constraining element. Fifth, we have mechanically completed the two additional poly-reactors in Pasadena, where the ramp is scheduled to begin next week. As a result of these installations, we are now at 75 to 100 metric tons of annualized poly capacity, have a number of... record number rectors available to produce poly, and have demonstrated good output in July.

Last, but not least, we have replaced the heat exchanger on Merano, started the expansion and are on track to finish the expansion and phases in August 1st, and September 1st, which will get us to the 8,000 metric tons of annualized capacity before the end of the third quarter. So, I would like to put all these events in perspective. ***Although we have had a difficult first half of this year, with ramps and unexpected events and discoveries,*** we have achieved numerous milestones and demonstrated capability for extended periods of time that have positioned us for significant growth in the second half of this year versus the first half. This is what we had hoped to accomplish when we last talked in our April call. [Emphasis added.]

67.    Defendant Gareeb then proceeded to answer questions posed by various analysts related to these incidents.  The following exchanges took place between defendant Gareeb and the analysts:

**Jesse Pichel - Piper Jaffray**: Right. I mean but it looks to me... correct me if I'm wrong that at least through the last few days, you've been running at well over 600 million run rate. But the midpoint of your guidance is below 600, and I'm just wondering why that is?

**GAREEB:** So, I think if you look, if you look back to exactly what Brett asked for, ***if you look back range of May and June, first half of June, we were running and we were positioned on a trajectory to do quite well. And then obviously the fire incident occurred, and so we are just being again having that extra degree of caution***; and in four weeks or five weeks, we will give you another update and share with you where we think we are.

*      *      *

**Paul Leming - Soleil - Princeton Tech**: Good afternoon. ***I was just curious given all the problems you've had in past in Pasadena and Merano***. I am curious as to what extent you've lost any progress on the expansion projects to get you to 15,000 tons of poly capacity by the end of 2010. Has there been any slippage on those projects or are there very separate engineering teams and you've been able to keep those moving at the desired rate through this difficult period?

**GAREEB**: I think Paul the best way to answer that is just give you the example of Unit 4 in Pasadena as an example. ***We have the issues in Q1 in Unit 3***; we learnt those lessons, applied them to Unit 4, brought it up a month ahead of the end of the quarter, and haven't had issues with it. So, we believe we are actually using the lessons we've learnt through the difficult period and applying them to our benefit as opposed to a detriment. So we don't believe there has been any impact; as a matter of fact, we believe that's going to help us during the course of remainder ramps.

29

\*      \*      \*

**Stephen O'Rourke** - Deutsche Bank: Okay. And I'm sure you've done a lot of recalled analysis of what caused some of these issues that you've got operationally. There are subsequent ramps coming, and how you handicapped the probability that similar events won't happen in the future? I mean they almost seem to sound kind of random.

**GAREEB**: Well, I think that's part the issue. So I think what we want to do is make sure that everybody... ***that we clearly communicate that the problems during the third quarter of last year through the first quarter of this year were primarily tied to the silane expansion***, which is the trickiest and most chemically complex part of this total expansion piece.

And I think we've demonstrated that the lessons we learnt in Unit 3, which was the first expansion unit in quite a while. We applied to Unit 4, which basically came up pretty flawlessly. Now the issue obviously becomes how do you avoid a fire well? You watch out for things like that. In the future, you can't really avoid the incorrect installation of a loose pipe fitting, but you watch out for that.

In terms of the issues in Merano, it was pretty uncharacteristic that a heat exchanger that's typically should be running for 20 years has a welding failure on the inside of the heat exchanger manufacturers defect after only a couple of years. So you watch out for those, but that's also partly why we take $800 million to $900 million capacity number or $700 million to $800 million capacity number, and we handicap it and provide guidance that talks about $560 million to $620 million.

\*      \*      \*

**Christopher Blansett – JPMorgan**: Hi, Nabeel; thanks for taking my questions. Two things here; when you look out into the difficulties you had in Merano, I mean could you quantify that just kind of get some color. ***It seems like that facility was down in a big way, based on its relatively small size.*** And then it's been resolved or you are in the midst of upgrading that right now. When will it come back online?

**GAREEB**: Yes. I don't... heat exchanger, there is not just one heat exchanger, right?

**Christopher Blansett – JPMorgan**: Right.

**GAREEB**: So, exchanger goes down; basically, you lose cooling capacity for a portion of your facility. And you can't run the same number of reactors that you would run if you had all of them operating. And basically that heat exchanger, so

30

it wasn't like the whole facility was down, ***it was the portion of the facility was down.*** And then subsequent to that, we basically obviously removed the heat exchanger and gas chemicals running through it and all kind of interesting stuff. And you've got to clean that out. It's accustomed piece of equipment. I mean these are large heat exchangers, so they don't sit on somebody's shelf. So you have to take that apart, understand what the issue was, figure out to fix, get accustomed one and then get installed. And all of that has been done, so new heat exchanger has been installed, it is up and running. And basically at Merano, we've got some reactors down primarily... not primarily, exclusively for the expansion. Basically, we are taking reactors down, modifying, upgrading them and basically for the expansion basis I talked about earlier. But the heat exchange is done, it's finished.

*     *     *

**Mehdi Hosseini – FBR**: Yes, thanks for taking question. I was wondering how come you didn't provide similar chart for the ramp up in your facilities in Italy.

**GAREEB**:  Yes, Mehdi basically on Italy, basically it's a simply very similar straight line across the... with the spike down for a day based on the issue and then coming back up and running at a lower rate. ***So the major interest seems to in Pasadena, the churns in Pasadena, et cetera, based on the issues we had had.*** So we thought that rather than complicated with four charts or three charts or what have you, we just provided the capacity amount [ph].

*     *     *

**Unidentified Analyst**:  Is there any more risk there or?

**GAREEB**: We are still investigating through that in terms of the root cause and what. It looks like potentially a welding aspect and what caused the welding aspect and all those good things. So we will do what we think is prudent and make sure that there's other heat exchangers from the same welder that have been working for very long period of time. [Emphasis added.]

68.    In fact, during the earnings call, an analyst from Oppenheimer questioned defendant Gareeb about his failure to timely disclose these incidents as the Company has done in the past.

**Sam Dubinsky – Oppenheimer**: Hey guys couple of quick questions. It seems just do the size estimate, just surprising that you guys can do a preannouncement. ***I am just wondering what the reasoning was for not doing a pre announce this time as you served down on in the past with sort of these ramp up issues and then I have a couple of follow up questions.***

31

**GAREEB**:  Sure, basically when we had the Merano issue, we thought that pretty comfortable that we could offset that with the strength of the silane... the poly production Pasadena as you can see from the charts through the month of May and early June. They are really up for the fire in Pasadena. We felt okay may be we won't be at the top end of the range, but we should be in the range. And basically we ended about 2% outside the range, which is about a couple of days' worth of production. ***And so we didn't take that as a pre announcement in terms of doing it earlier in this quarter if you will, primarily because we didn't think 2% outside the bottom end of the range was material if you will.***

***But also we wanted to provide a second half up date that we would not have been ready to provide. And we also wanted to have the demonstrated recovery both from the fire as well as the replacement of the equipment in Merano to ensure that we had a pretty solid set of numbers in our head for Q3 and for the second half of the year.*** [Emphasis added.]

69.     Other analysts were also shocked the Company did not pre-announce this material information.  In a report dated July 23, 2008, a Deutsche Bank analyst expressed surprise at the Company's disclosure: "This is the third miss in four quarters… ***we were surprised the company did not pre-announce these results.***" [Emphasis added.]

70.     On July 24, 2008, an analyst from Credit Suisse stated, "This was the first instance company had to deliver on a complex factory build – and for the third time company slipped on execution. ***Company did not preannounce [] either compounding issues – making it "Strike 3" for several investors we spoke with …***" [Emphasis added.]

71.     Furthermore, the Credit Suisse analyst's comments indicate that the Company's failure to disclose the production issues at the Company's Italian facility was material:

Valuation. We have had our concerns owning MEMC for the long run, but we were looking for a trade into earnings, given strong spot poly sales and our math on earnings potential. The model worked fine – ***only we did not have the Italy production datapoint*** and our volume assumptions were off (by 5%) . . . .

**Fear of the unknown . . . .** what else is wrong with production that we don't know about. Limited access to second level mgmt ***and low disclosures*** make it difficult to evaluate if the company has the right team in place to execute. [Emphasis added.]

72. In a report dated July 24, 2008, an Oppenheimer analyst made the following comments that also demonstrated the materiality of the production issues:

> *[T]he magnitude of the miss was significant.* MEMC experienced another quarter of polysilicon production missteps, this time with both its Merano and Pasadena facilities. Due to problems with a heat exchanger, Merano caused a 5% production shortfall. Pasadena experienced a fire that required a 1-week shutdown. *Had it not been for these issues, MEMC would have exceeded the high-end of guidance.* Given the recent slew of production problems and concerns over soft semiconductor demand, MEMC lowered already conservative guidance for 2008. [Emphasis added.]

**Pattern of Disclosures Post-Class Period**

73. Even after the Class Period, Defendants consistently and timely updated investors when material events occurred that *might* have an impact on production, like they had always done prior to the Class Period.

74. On August 5, 2008, the Company issued a press release entitled "*MEMC Provides Update on Tropical Storm Edouard*," in which the Company discussed a storm's two-day impact on production at the Pasadena, Texas facility, and stated, in part, the following:

> The company reported that it has taken safety precautions in preparation for heavy weather associated with Tropical Storm Edouard at its Pasadena, Texas facility. As part of these precautions, the company has moderated operations in various areas of the facility, which is currently anticipated to *have approximately a two day effect on polysilicon production. Should circumstances cause a material change to this assessment, or a material impact to the company's financial targets, the company will issue another press release.* [Emphasis added.]

75. On September 2, 2008, the Company provided an update to the charts issued with the July 23, 2008 press release entitled "*MEMC Provides Mid-Quarter Update.*" The charts were updated to include production up to September 1, 2008. The charts also included the material events that occurred at the Pasadena, Texas facility impacting output. The second chart only listed three events; only one of them, the fire, was not timely revealed to investors.

Curiously, while the storm was only anticipated to have a two-day effect on production and the gas leak only closed the facility for a day, the fire was a week long event.

76.     On September 11, 2008, the Company issued a press release entitled "*MEMC Provides Update on Hurricane Ike*," reporting that it would be shutting down the Pasadena facility until early next week, which was not as long as the undisclosed fire.  The press release stated, in part, the following:

> The company reported that it has started taking safety precautions at its Pasadena, Texas facility in preparation for Hurricane Ike. As part of these precautions, the company has started shutting down operations in preparation for the heavy weather which is currently projected to impact the area. ***Operations are anticipated to resume early next week, potentially resulting in approximately a five day impact on polysilicon production at this facility. This degree of impact for unanticipated circumstances was contemplated in the range of financial targets provided in the mid-quarter update on September 2, 2008.*** Should circumstances change significantly, the company will issue another press release. [Emphasis added.]

77.     On September 15, 2008, the Company issued another press release entitled "*MEMC Provides Status Update Post Hurricane Ike*," to update investors on Hurricane Ike and its effect on production.  Commenting on the press release, defendant Gareeb stated, in part, the following:

> I am happy to report that our Pasadena facility does not appear to have sustained any major structural damage. We maintained power throughout the storm and the occupancy crew that stayed on site through this period is safe. Our restart activities commenced as planned over the weekend, however, we have been notified of raw material delays by our suppliers due to their own startup difficulties. We are working closely with our suppliers to understand and overcome these delays. We are not updating guidance at this time.

78.     On September 24, 2008, MEMC provided a third update on Hurricane Ike and revised its guidance.  Commenting on the press release entitled "*MEMC Provides Operational and Financial Update Following Hurricane Ike*," defendant Gareeb stated, in part, the following:

> As stated in our press release from last week, our Pasadena facility did not

34

experience any apparent major damage, and we were able to start up the plant systems in preparation for production to begin Monday, September 14, as planned. However, some of our regional suppliers had startup difficulties primarily due to power availability, plant issues, and pipeline damage as a result of the Hurricane, preventing them from starting high volume delivery of some raw materials until yesterday. This resulted in the Pasadena facility running at very low utilization levels through the early part of this week. ***We now believe we are at the tail end of these raw material issues, which should allow us to achieve normal production rates within the next few days. Assuming there are no significant issues during this ramp, we now expect the cumulative impact of these delays to be approximately 15 days worth of production instead of the 5 days originally forecasted.*** Consequently, we are now targeting third quarter 2008 revenue to be approximately $530 million, plus or minus $10 million, with gross margin of approximately 51%, plus or minus 1%. Operating expenses are still targeted to be approximately $43 million.

We do not expect any long-term impacts from these delays, nor do we expect any significant interruption to our on-going capacity expansion activities. We would like to publicly recognize the commitment and hard work of our employees, as well as those of our vendors, in enabling us to recover from the effects of this storm, in spite of the challenges the Hurricane has presented to them in their personal lives. [Emphasis added.]

79.     On November 17, 2008, the Company filed its Form 8-K with the SEC, signed by

defendant Hannah, which attached a press release entitled "*MEMC Provides Fourth Quarter*

*Financial Update.*" The press release stated, in part, the following:

The decrease in targeted operating expenses is due to the decrease in stock compensation expense resulting from the forfeiture of option grants in connection with the decision of the company's former Chief Executive Officer, Nabeel Gareeb, to step down from his positions with the Company.

80.     Commenting on the new guidance, Marshall Turner, the Interim Chief Executive

Officer, stated, in part, the following:

***The weak macroeconomic environment has continued to deteriorate, and has had an increasingly negative effect on the semiconductor and solar markets over the past few weeks. These effects are quickly cascading backward through global supply chains, and we cannot expect to be immune to the impact on our customers in all the markets we serve.*** This recent sequence of events has increased pricing pressure in the short term solar market and exacerbated the demand weakness in the semiconductor market. We expect to use our increased polysilicon production in the fourth quarter to offset some of the effects of this

reduced pricing through increased wafer sales. Given these variables and the rapidly evolving macroeconomic environment, we are maintaining a wide range of financial targets to indicate our current understanding of these uncertain market conditions. Even in this type of environment, the business model MEMC has put in place over the past few years is enabling us to demonstrate healthy financial metrics relative to our peers. [Emphasis added.]

81.     On December 17, 2008, MEMC filed its Form 8-K with the SEC, signed by

defendant Hannah, attaching a press release entitled "*MEMC Updates Fourth Quarter Outlook*."

The press release revised its fourth quarter guidance, and stated, in part, the following:

Over the last few weeks, end demand for many industries, including semiconductor and solar, has continued to decline as a result of the global economic slowdown. In addition, the solar market has been impacted by the reduced availability of credit, which has limited the purchasing ability of some solar customers. *Given these factors, combined with the continuing inventory reduction efforts by semiconductor device makers, the company has revised its fourth quarter outlook.* [Emphasis added.]

82.     Commenting on the revised guidance, Marshall Turner, MEMC's Interim Chief

Executive Officer stated, in part, the following:

The revised outlook is primarily a result of a continued deterioration in end demand for semiconductor products amid the weak macroeconomic environment. In addition, we have reduced certainty that some remaining semiconductor orders that have been booked for delivery this quarter will be pulled by customers, and that some customers who have placed short-term orders for solar products will meet all of our purchase conditions, given their tight credit environment. We are revising our outlook to account for this uncertainty.

83.     MEMC has consistently revised its guidance outlook and timely reported material

events as alleged above, except for the material omissions in regard to the June fire at the

Pasadena, Texas facility and the heat exchanger problems at the Merano, Italy facility.

Defendants knew the importance of these updates to investors since each day of production was

material to reaching the revenue targets set by the Company for each quarter.  However, the

Company failed to make the disclosures knowing that they would have a significant effect on the

Company's stock, especially considering the Company's previous production problems.  This is

obvious by defendant Gareeb's statement when asked by an analyst during the July 23, 2008 earnings call why the fire and the heat exchanger problem was not timely announced. Defendant Gareeb stated, in part, the following:

> But also we wanted to provide a second half up date that we would not have been ready to provide. And we also wanted to have the demonstrated recovery both from the fire as well as the replacement of the equipment in Merano to ensure that we had a pretty solid set of numbers in our head for Q3 and for the second half of the year.

## LOSS CAUSATION

84.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

85.     In light of the Company's stated desire to be extra cautious in projecting its results due to previous production concerns and its established practice of advising the public of events that might impact the level of production, the Company's decision to withhold from investors that there had been a fire serious enough to interrupt production for a week and to withhold that there had been an equipment failure that had reduced anticipated production by almost 5% caused the value of MEMC's securities to be artificially inflated during the Class Period.

86.     During the Class Period, Plaintiff and the Class purchased MEMC's securities at artificially inflated prices and were damaged thereby. The price of MEMC's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

87.     Because of the material information that was finally revealed on July 23, 2008, the Company's shares fell $11.57 per share, or 21.51 percent, to close on July 24, 2008 at $42.23 per share, on unusually heavy trading volume. As the chart below demonstrates, Class members

suffered economic losses from the curative disclosure made by Defendants on July 23, 2008:



88.     Since July 23, 2008, MEMC's securities have not traded above the prices at which Class members purchased those securities prior to July 23, 2008 during the Class Period. As a result, members of the Class who purchased MEMC securities during the Class Period and continue to hold those securities, have sustained economic injury resulting from the decline(s) in the value of MEMC securities resulting from the revelations of Defendants' misstatements and/or omissions during the Class Period.

89.     Members of the Class who purchased MEMC securities during the Class Period, and sold those securities after the end of the Class Period, have suffered economic injury caused by Defendants' misrepresentations and/or omissions during the Class Period that were not fully revealed until July 23, 2008.

90.     Thus, the damage suffered by Plaintiff and other members of the Class was a direct result of Defendants' fraudulent scheme to artificially inflate the price of MEMC securities

and the subsequent significant decline in the value of MEMC securities when Defendants' prior omissions during the Class Period were revealed.

91.     The foregoing allegations describe Plaintiff's general theory of damages, demonstrate that Plaintiff's damages were caused by the scheme to defraud as alleged herein, and negate any inference that Plaintiff's losses were the result of general market conditions or other factors wholly unrelated to Defendants' omissions alleged herein.

## SCIENTER ALLEGATIONS

92.     As alleged herein, Defendants acted with scienter in that the nature of the Texas plant fire and the Italian plant equipment failure were such that each of the Defendants would have been privy to and known about those events immediately after their occurrence.  Further, Defendants, who had control of the Company's dissemination of information, knew that these potential, and ultimately, actual, material events had not been disclosed by the Company to, and, in fact, had been withheld from, investors in MEMC securities.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding MEMC, their control over, and/or receipt and/or modification of MEMC's disclosures, participated in the fraudulent scheme alleged herein. Given the Company's past production issues, the impact the problems encountered at the Company's Italian and Texas facilities would have on production as well as Defendants' statements on July 23, 2008, there can be no doubt that Defendants acted with scienter, in that they knew, from the start of the Class Period, of the production issues and the potential and/or actual effect they would have on production and the Company's financial results, yet purposely failed to disclose this information to investors.

## NO SAFE HARBOR

93.     The statutory safe harbor provided for forward-looking statements under certain

circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of MEMC who knew that those statements were false when made.

## COUNT I

### Violation of Section 10(b) of The Exchange Act
### and Rule 10b-5 Promulgated Thereunder
### (Against All Defendants)

94.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

95.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase MEMC's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

96.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made

untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for MEMC's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

97.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about MEMC's financial well-being and prospects, as specified herein.

98.     These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of MEMC's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about MEMC and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of MEMC's securities during the Class Period.

99.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's

management team or had control thereof; (ii) each of these Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

100.    The Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing MEMC's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and misstatements of the Company's financial well-being and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

101.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of MEMC's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of

MEMC's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired MEMC's securities during the Class Period at artificially high prices and were damaged thereby.

102.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that MEMC was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their MEMC securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

103.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

104.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of The Exchange Act
### (Against the Individual Defendants)

105.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

106.    The Individual Defendants acted as controlling persons of MEMC within the

meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, and participation in and/or awareness of the Company's operations, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements and/or the nondisclosure of material events.

107.   In particular, each of these Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

108.   As set forth above, MEMC and the Individual Defendants each violated Section 10(b) and Rule 1 0b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)   Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)   Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)   Awarding Plaintiff and the Class their reasonable costs and expenses

incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury.

Dated: February 23, 2009                    Respectfully submitted,

**THE SIMON LAW FIRM, P.C.**

  /s/   John E. Campbell
John E. Campbell, #543242
John Simon, #4371
Erich Vieth, #4608
701 Market St., Suite 1450
St. Louis, MO 63101
Telephone: (314) 241-2929
Facsimile: (314) 241-2029

*Liaison Counsel for the Class and Counsel for Lead Plaintiff Mahendra A. Patel*

**BROWER PIVEN**
  A Professional Corporation
David A.P. Brower
Jessica Sleater
488 Madison Avenue
Eighth Floor
New York, New York 10022
Telephone: (212) 501-9000
Facsimile:  (212) 501-0300

**BROWER PIVEN**
  A Professional Corporation
Charles J. Piven
Yelena Trepetin
World Trade Center-Baltimore
401 East Pratt Street, Suite 2525
Baltimore, Maryland 21202
Telephone: (410) 332-0030
Facsimile:  (410) 685-1300

*Lead Counsel for the Class and Counsel for Lead Plaintiff Mahendra A. Patel*

## CERTIFICATE OF SERVICE

I hereby certify that this Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws with Exhibit A was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and electronically mailed to those indicated as non-registered participants on February 23, 2009.

*/s/*  John E. Campbell

John E. Campbell, #543242
